Richard L. **BAKER,** Appellant,

and Irma Baker,

v.

Donald B. **BAKER;** Pro–Mark Co.; Midwest Marketing Company; H.J. Heinz Company; Donald Olson, Appellees.

Richard L. **BAKER,** Appellee,

and Irma Baker,

v.

Donald B. **BAKER,** Appellant,

Pro–Mark Co.; Midwest Marketing Company; H.J. Heinz Company; Donald Olson.

Nos. 90–2386, 90–2414.

United States Court of Appeals, Eighth Circuit.

Submitted April 10, 1991.

Decided Dec. 20, 1991.

Deborah L. Doak, Clayton, Mo., argued (Norman A. Selner on the brief), for appellant.

Thomas C. Walsh, St. Louis, Mo., argued (Erwin O. Switzer III, on the brief), for appellee.

Before LAY, Chief Circuit Judge, PECK * and ROSS, Senior Circuit Judges.

ROSS, Senior Circuit Judge.

This lawsuit involves a dispute between two brothers, Donald and Richard Baker, over a partnership agreement to own a minority interest in two Tulsa, Oklahoma based companies, Pro–Mark Company (Pro–Mark) and Midwest Marketing Company (Midwest). Richard now appeals the district court's ruling that he has no contractual or other interest in those companies.

I.

In 1967, Donald Baker became part owner of a small food brokerage company in St. Louis, Missouri, which was eventually named Kline–Baker and Associates (Kline–Baker). In 1970, Donald Baker developed a fortified skim milk product and began negotiations to enter into a joint venture with The Williams Company, a Tulsa based oil pipeline company, through its subsidiary Nutri Co. The general proposal called for Nutri Co. to provide capital for a venture to distribute fortified skim milk under the Weight Watchers label. The venture was to go forward through two subsidiaries of Nutri Co.—Pro–Mark Company and Midwest Marketing Company, which were incorporated December 7, 1970 to proceed with the venture. In July 1971, Donald Baker moved from St. Louis to Tulsa, Oklahoma to work for Pro–Mark and Midwest, while Richard remained in St. Louis and assumed full management of Kline–Baker.

From 1970 to 1972 there were various discussions, negotiations and proposals between Donald and The Williams Company representatives concerning the identity of minority ownership in Pro–Mark and Midwest. One proposal was to give an interest in Pro–Mark and Midwest to Kline–Baker. On December 28, 1970, a letter agreement proposing that Kline–Baker would own 49% (490 shares) of Pro–Mark and 48% (480 shares) of Midwest was signed by Nutri Co. Richard subsequently issued two Kline–Baker checks in the amounts of $490.00 and $480.00 for payment of the Pro–Mark and Midwest stock. Although the letter agreement of December 1970 stated that Nutri Co. and Kline–Baker were to hold stock in Pro–Mark and Mid-

* The HONORABLE JOHN W. PECK, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

west, no stock of either company was ever issued to Kline–Baker.

Subsequently, after The Williams Company objected to any corporate ownership of the minority interest, there was a discussion of the formation of D & R Enterprises, a proposed partnership whereby Donald and Richard would own the minority interest in Pro–Mark and Midwest. According to Richard, the proposal included a provision that Donald would own 65% of D & R and Richard would own 35%. Donald contends that no agreement was ever reached on these proposals and no documents were ever executed.

According to Richard, however, Nutri Co. agreed to the D & R proposal and Donald sent Richard a letter agreement prepared by Nutri Co. encompassing this deal. Richard contends that at this point he believed that stock in Pro–Mark and Midwest had been issued in the name of D & R Enterprises for the benefit of Donald and Richard.

Whatever the effect of these previous attempts to establish minority ownership in Pro–Mark and Midwest, a final agreement was eventually reached in late 1972, when Nutri Co., unhappy with the lack of return on its investment, demanded that the minority interest in Pro–Mark and Midwest be reduced to 35%. On December 7, 1972, a series of documents was signed and initialed by Donald and Richard, and backdated to the original date of incorporation of Pro–Mark and Midwest, December 7, 1970. These documents expressly superseded all previously discussed proposals and stipulated that Donald was to be the only minority shareholder.

Specifically, the documents provided (1) that the minority interest in Pro–Mark and Midwest would be reduced from 49% to 35%; (2) that Donald Baker personally would own the entire minority interest; (3) that Donald Baker could not transfer any of his shares without Nutri Co.'s consent; and (4) that Kline–Baker released any claim it had to any interest in either Pro–Mark or Midwest. Richard Baker personally signed the Kline–Baker release and initialed every page of these documents which set forth the understandings and agreements concerning the ownership and operation of Pro–Mark and Midwest.

Not surprisingly, Richard interprets these documents in a different light. He claims that at the same time that Nutri Co. was making the demands to decrease the minority ownership of Pro–Mark and Midwest, Donald informed Richard that the companies needed a sales manager to promote their business and that Donald Olson would do this job if he was made an equity participant. Richard contends that Donald proposed that in exchange for reducing Richard's share in the joint venture from 35% under the D & R deal to 15%, Donald would increase Richard's stock in Kline–Baker and decrease his own interest therein so that their interests in Kline–Baker would be roughly inverse to their respective shares in their joint venture in Pro–Mark and Midwest.

Then, according to Richard, in May 1973 one last attempt was made to obtain Nutri Co.'s approval of a transfer of a portion of Donald's stock to Richard and to Donald Olson, Pro–Mark's sales manager. This effort was part of a proposal to create a limited partnership called North American Food Enterprises. Nutri Co., however, would not consent, and Richard acknowledges that formation of the entity was never consummated.

Richard places primary emphasis on documents which were apparently drafted sometime in late 1972 or early 1973, about the same time that Nutri Co. insisted upon a reduction of the minority interest in Pro–Mark and Midwest. According to Richard, both Donald's and Richard's shares in the companies were to be reduced uniformly, and although Donald would be the nominal owner of the entire 350 shares, Donald agreed to transfer 53 of those shares to Richard in order to maintain Richard's 15% interest in the companies. Richard refers to several documents in the record which tend to substantiate this agreement. The first is a document signed by both Donald and Richard, with an unsigned signature line for Nutri Co., in which Donald assigned 53 shares of Pro–Mark and Midwest

to Richard. The next set of documents contains two promissory notes in which Richard promises to pay $6,075 for his interest in Pro–Mark and Midwest and to allow his shares to remain as collateral for his notes. Finally, Richard refers to a document in which Donald agrees to transfer 70 of his shares to Donald Olson. This document also references Donald's agreement to transfer 53 shares to Richard.

While Richard contends that these documents convincingly establish his ownership in the companies, Donald asserts that these documents were drafted by Richard's attorney and were proposals only, which had no legally binding effect. It is undisputed that although the documents were sent to Nutri Co. for its approval and signature, Nutri Co. never signed the document consenting to ownership of shares by Richard.

After the December 1972 agreement, Donald claims that in early 1974, when he received tax information from Kline–Baker's accountant relating to the calendar year 1973, he noticed that the shareholdings in Kline–Baker had been altered. The statement he received indicated that Richard had unilaterally transferred 21 of the company's existing 60 shares out of Donald's name and into his own. Donald contends that he promptly flew to St. Louis to discuss this matter with Richard. When confronted, Richard allegedly stated that he transferred the 21 shares because by that time it was apparent that he was not getting anything from Pro–Mark and Midwest and that it was time to readjust the ownership in Kline–Baker. In response Donald allegedly told Richard that they were through, that they would go their separate ways and have nothing more to do with each other. Richard continued to run Kline–Baker in St. Louis until late 1974 when the company's corporate charter was forfeited and the remaining assets were transferred to another food broker, Harwood, Goldford & Baker, in return for which Richard received one-third interest in that company.

In the spring of 1974, Nutri Co. sold its stock in Pro–Mark and Midwest to Donald Newman and Irvin Frank, and the voting trust agreements were dissolved. Donald Baker told Newman and Frank that he wanted to obtain stock for key players in Pro–Mark and Midwest; however, he never mentioned his brother, Richard. Moreover, no documents which may have indicated Richard's or Kline–Baker's stock interest were ever shown to Newman and Frank.

In 1983, Pro–Mark was merged into The Pro–Mark Companies, Inc., which in turn became the owner of Midwest Marketing Company. Donald Baker was president of The Pro–Mark Companies, Inc. from its inception until its sale to H.J. Heinz Company on July 1, 1986. Within ten days of the sale, Richard's lawyer wrote a letter to Donald, demanding a portion of the proceeds. Donald refused and this lawsuit ensued.

## II.

On appeal, Richard makes various claims regarding the district court's findings that there was no fraud and no contract between Donald and Richard whereby Richard acquired ownership rights in Pro–Mark and Midwest. Further, Richard asserts that the district court erred in refusing to award damages upon its finding that the release of Kline–Baker's interest in the companies failed for lack of consideration.

The critical point at which to assess the existence of a contract between Donald and Richard for the ownership by Richard of an interest in Pro–Mark and Midwest is at the time the December 1972 agreement was entered into. Although Richard contends that a contractual relationship existed before the 1972 agreement, and although the record establishes that serious attempts were made to provide Richard an interest in the companies, the December 1972 agreement, which Richard assented to, specifically provides that this agreement supersedes all previous agreements.

█ Richard is correct that when this series of documents is examined in total, it appears that he received at least an equitable ownership interest in 53 shares of the two companies. First, Donald executed

a document assigning his right to 53 shares of the companies to Richard. This attempt to assign 53 shares to Richard is further evidenced by the two promissory notes in which Richard promises to pay $6,075 for his interest in Pro–Mark and Midwest and to allow his shares to remain as collateral for his notes. Finally, a document which purports to transfer 70 of Donald's shares to Donald Olson also references Donald's agreement to transfer 53 shares to Richard.

While it is true that the 1972 documents provided that Donald would be the sole minority shareholder and that Nutri Co. must consent to any attempted transfer of the minority shareholder's interest, it is clear from the record that Donald and Richard reached an agreement concerning the transfer of 53 shares to Richard. Although there was no formal contract, we find that as a result of this agreement, Richard received an equitable ownership interest in 53 shares of Pro–Mark and Midwest. We emphasize that Richard's interest was only equitable in nature. It is undisputed that Nutri Co. did not at any time consent to Donald's transfer of 53 shares of stock to Richard, although that consent was expressly required in order to effectuate a transfer of Donald's interest. We reject Richard's assertion that Nutri Co.'s consent to the transfer is evidenced by its letter requesting Richard's signature. Nutri Co. failed to return a fully executed copy of the agreement to Richard as it had said it would do, and there is no evidence that this document was ever signed by Nutri Co. Despite the fact that Richard never received Nutri Co.'s written approval of the stock transfer, Richard continued to believe that the 53 share transfer was a fully executed transaction.

The discussion does not stop here, however, because subsequent to the 1972 deal, there was little, if any, effort on Richard's part to substantiate his claim to those shares. In fact, in 1974, when Donald claims that he discovered that Richard had unilaterally transferred 21 shares of Kline–Baker's 60 shares out of Donald's name and into his own, Donald and Richard appeared to have reached an understanding that Richard would retain the additional 21 shares and enjoy full control of Kline–Baker, Donald would have sole control of Pro–Mark and Midwest, and the two brothers would go their separate ways. From this time, there is very little evidence in the record that the two brothers even spoke with one another.

The record further establishes that from 1974 to 1986, when this suit was filed, Richard was silent as to any interest he believed he may have held in Pro–Mark and Midwest. It was not until 1986, after Donald sold The Pro–Mark Companies to H.J. Heinz Company, that Richard filed his claim for his alleged interest in the companies. Richard's actions subsequent to the 1974 meeting appeared as if Richard understood that his interest in the Baker brothers' enterprises remained with Kline–Baker only. Richard never received financial reports from Pro–Mark or Midwest, although he did receive such reports from Kline–Baker, Kline–Crupi and Harwood, Goldford & Baker, companies all similar in size to Pro–Mark and Midwest. On various personal financial statements and loan applications drafted between 1979 and 1986, Richard failed to list any interest in Pro–Mark or Midwest as part of his assets. In fact, on a personal financial statement dated July 6, 1986, six days after the closing of the H.J. Heinz transaction, Richard failed to list any interest in Pro–Mark or Midwest. However, some year and two months after this suit was filed, Richard listed a 15% interest in the companies on a financial statement filed with the First Bank and Trust Company, listing the interest as worth 2.1 million dollars.

Laches precludes a lawsuit when a plaintiff is guilty of unreasonable and unexcused delay in asserting his claim, resulting in prejudice to the defendant. *Grieshaber v. Grieshaber*, 793 S.W.2d 161, 163 (Mo.Ct.App.1990). "Mere delay does not of itself constitute laches, the delay must be unreasonable and unexplained and must be shown to have caused disadvantage and prejudice to the defendant." *Perez v. Missouri State Bd. of Registration for the Healing Arts*, 803 S.W.2d 160, 166 (Mo.Ct.App.1991).

The length of the delay here is extraordinary—fourteen years from the time

of the December 1972 agreement and twelve years from the time Richard and Donald appeared to have agreed to go their separate ways. This delay is manifestly unreasonable as a matter of equity and demands the application of the laches doctrine.

▮ Prejudice which supports laches can be demonstrated in the loss of evidence which would support the position of the defendant. *Id.* Prejudice from the unreasonable delay results from the loss of evidence in support of the parties' claims. Most of the evidence at trial consisted of documents which were selectively retained by Richard over the years and sketchy recollections of memories of witnesses stemming back some sixteen to twenty years. Important documents were no longer in existence and various witnesses were no longer available. Undoubtedly, Donald's case has been prejudiced by Richard's unreasonable delay in bringing his claim.

As a final matter, we note our disagreement with the district court's finding that Kline–Baker's December 1972 release of any interest in Pro–Mark and Midwest was invalid for lack of consideration. It is uncontested that Richard willingly agreed to the release because of his belief that he would acquire 53 shares of Pro–Mark and Midwest. Further, it is undisputed that Richard received an additional eight shares of Kline–Baker stock on January 8, 1973, as well as an additional twenty-one shares at some later time. Richard concedes at trial that these stock transfers were made in order to compensate him for the reduction of his interest in Pro–Mark and Midwest. While in our view, this constitutes sufficient consideration for the release of the Kline–Baker interest, our holding does not hinge on this determination because the doctrine of laches bars any claim under this theory as well.

### III.

In sum, we affirm the district court's finding that there was no legal contract for a minority ownership interest by Richard in Pro–Mark and Midwest. We conclude, however, that through the various negotiations and discussions, and particularly the documents executed in late 1972 and early 1973, Richard acquired an equitable ownership interest in the companies. Richard's failure to assert that interest in the course of some fourteen years, however, now precludes his assertion of any interest in those companies by way of the doctrine of laches. Based on the foregoing analysis, we also affirm the district court's finding that Richard has failed to establish that Donald acted fraudulently in the various negotiations and discussions he had with Richard.

Accordingly, the final judgment of the district court denying Richard's claims for monetary damages on contract and fraud theories is affirmed.